*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. A. FAULKNER, Minor.

FOR PUBLICATION
April 16, 2025
12:11 PM

No. 369927
Livingston Circuit Court
Family Division
LC No. 2023-016620-NA

Before: MURRAY, P.J., and M. J. KELLY and N. P. HOOD, JJ.

PER CURIAM.

Petitioner, the Department of Health and Human Services, appeals as of right the trial court order declining to exercise jurisdiction over respondents' minor child. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

Respondents live in Texas and their child was born there. Because the child tested positive for multiple controlled substances when he was born, Texas Child Protective Services (CPS) allegedly devised a "safety plan," under which respondent-mother and the child would move to Michigan with the child's maternal grandparents,[1] and, while in Michigan, respondent-mother would complete any services that would be required of her by Michigan CPS in order to retain custody of her child.

Respondent-mother initially agreed to the safety plan, and respondent-father made comments suggesting that it was a good idea for respondent-mother to work with Michigan CPS instead of Texas CPS. Yet, when the grandparents suggested that respondent-father could live with a friend of theirs in Michigan so that he could receive "treatment" and participate in any classes required by CPS, he became upset and, according to the grandmother, punched a fence,

---

[1] Because the child's paternal grandparents were not involved in the proceedings, for ease of reference, we will refer to the grandparents without the familial modifier of "maternal."

kicked a dog, and never answered whether he would do so. Instead, respondent-father made comments hinting that he would commit suicide and he threatened to kill the child's grandfather. As a result of the threat, the grandparents stopped communicating with him even though he sent them multiple text messages.

Respondent-mother, the child, and the grandparents started driving to Michigan after the child was released from the hospital. However, approximately three hours into the journey, the grandmother and respondent-mother got into an altercation at a gas station because the grandmother believed that there was marijuana on respondent-mother's seat cushion. Respondent-mother became angry at the allegation and denied that it was marijuana. Although the grandparents pleaded with her to get back in the vehicle, she refused and walked away. The grandmother warned respondent-mother that if she left she could "kiss the baby goodbye." She also snatched respondent-mother's cell phone from her back pocket as she was walking away and withheld it from her. At one point, she put her hand on respondent-mother's chest to prevent her from retrieving her phone. The grandmother realized that she was being "ridiculous" and so she got into the vehicle with the phone. Respondent-mother then walked behind a building with her dog, but not her luggage.

After five or ten minutes, the grandparents drove away with the child. They called Texas CPS because they did not know what to do. The grandmother testified that respondent-mother did not contact them for 48 hours; however, she also testified that almost immediately after they left, respondent-mother called and told them that she had called the police and accused them of kidnapping her child. Rather than return with the child, the grandparents gave the police the phone number for the caseworker at Texas CPS. They also contacted CPS in Michigan. Eventually, they checked into a hotel with the child and, on the advice of someone, they did not tell respondent-mother their exact whereabouts. It is unclear who advised them to conceal the child's location; however, it may have been Texas CPS, Michigan CPS, or law enforcement, all of whom the grandparents were in contact at that time. Regardless, the grandparents tried unsuccessfully to convince respondent-mother to resume the trip to Michigan with them.

After a few days, the grandparents took the child to Michigan. At that time there was no court order giving the grandparents care or custody of the child, they did not have a guardianship or a power of attorney for the child, and there was not a CPS "order" allowing them to take him. Further, the grandparents did not ask respondents for permission to take the child to Michigan; instead, they took the child to Michigan without telling respondents that they were doing so. However, the grandmother testified that when she made the decision to continue to Michigan, she was in contact with CPS in both Texas and Michigan.

After the grandparents returned to Michigan, they resumed communicating with respondent-mother, who repeatedly requested that her child be returned to her care. The grandparents did not return him. Instead, they offered to "help" respondent-mother if she came to Michigan by getting her substance-abuse treatment. According to the grandmother, respondent-mother sometimes seemed agreeable to the idea, but was hesitant because of respondent-father's suicidal ideation.

In the meantime, a caseworker at Michigan CPS contacted respondents to discuss the possibility of the grandparents becoming the child's legal guardians. She presented it as an

alternative to filing a petition initiating child-protective proceedings. Respondents were not agreeable to that plan. Nevertheless, the grandparents filed a petition for guardianship, which was not granted because respondent-mother objected to it.

Thereafter, DHHS filed a petition seeking to remove the child from respondents' care and asking the trial court to take jurisdiction over the child. The caseworker admitted that a few days before the petition was filed respondent-mother asked if there was anything preventing her from travelling to Michigan to pick up her child. The caseworker told her that there was not any paperwork or "anything" that restricted respondents from coming to get the child. However, respondents, who were still in Texas, were not offered any assistance with transportation or lodging costs. Further, the caseworker was unaware of whether they even had reliable transportation and she did not conduct an assessment of the child's potential home environment in Texas. Instead, she requested assistance from Texas CPS, which was uncooperative. As a result, the caseworker did not know whether "preparations" had been made for the child to live in Texas.

Respondent-mother admitted to the caseworker that she had a history of substance abuse, but she denied currently using any substances. Respondent-father, likewise, admitted to prior substance-abuse issues, but denied any current use. No drug screens were offered to respondents by Michigan CPS, and the caseworker was uncertain whether any of the Texas drug screens were positive for controlled substances. Regardless, respondent-mother told the caseworker that she had located an inpatient substance-abuse program in Texas that she believed would help her "stay clean." Respondent-mother indicated that the child could stay with her during the inpatient treatment, but that she would be unable to enroll until the child was returned to her care. The caseworker never investigated the program. Instead, she reached out to Texas CPS, which remained uncooperative.

The trial court authorized removal of the child, and an adjudicatory trial was held. Following the trial, the court declined to exercise jurisdiction, finding that the statutory bases for taking jurisdiction that were alleged in the petition were not supported. This appeal follows.

## II. JURISDICTION

## A. STANDARD OF REVIEW

Petitioner argues that the trial court erred by declining jurisdiction because the evidence amply supported taking jurisdiction and because the trial court mistakenly considered petitioner's efforts to prevent removal as part of its jurisdictional decision. "To acquire jurisdiction, the factfinder must determine by a preponderance of the evidence that the child comes within the statutory requirements of MCL 712A.2." *In re Miller*, 347 Mich App 420, 424; 15 NW3d 287 (2023) (quotation marks and citation omitted). We review for clear error the trial court's factual findings related to its jurisdictional decision. *Id*. at 425. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. (quotation marks and citation omitted).

## B. ANALYSIS

### 1. ABANDONMENT

Petitioner first contends that jurisdiction was proper under MCL 712A.2(b)(1), which provides in relevant part that the trial court may take jurisdiction when a child "is abandoned by his or her parents." The term "abandoned" is not statutorily defined and there is no binding caselaw defining the word in the context of MCL 712A.2(b). Words undefined by a statute must be given their plain and ordinary meaning. *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008).

Petitioner suggests that "abandonment" is synonymous with "desertion," which has been defined as an intentional and willful act. See *In re B & J, Minors*, 279 Mich App 12, 18 n 3; 756 NW2d 234 (2008). We do not agree, however, the Legislature intended for "abandonment" and "desertion" to be used interchangeably in MCL 712A.2(b). Unlike MCL 712A.19b(3), which uses both "abandonment" and "deserted" in different subdivisions setting forth the statutory grounds for termination of a parent's parental rights, MCL 712A.2(b)(1) only uses the word "abandoned." "When the Legislature includes language in one part of a statute that it omits in another, this Court presumes that the omission was intentional." *In re Keyes Estate*, 310 Mich App 266, 272; 871 NW2d 388 (2015). Accordingly, we will only consider whether the child was abandoned by respondents, not whether he was deserted.

Next, petitioner contends that abandonment (or desertion) of a child occurs in cases where a parent fails to make regular and substantial efforts to communicate with the child. In support, petitioner directs this Court to *In re Sterling*, 162 Mich App 328, 225; 412 NW2d 284 (1987). In turn, respondent-father directs this Court to *In re Sears*, 150 Mich App 555, 560; 389 NW2d 127 (1986), which uses the same definition. But the definition of "abandoned" used in *Sterling* and *Sears* is based upon language included in a prior version of MCL 712A.19a. The statute was amended in 1988, see 1988 PA 224, and it no longer includes such language. Furthermore, the language relied upon by the Courts in *Sterling* and *Sears* addressed statutory grounds to terminate a parent's parental rights, not statutory grounds for the court to exercise jurisdiction over the child. Accordingly, we do not find the interpretation of "abandoned" in those cases to be persuasive.

Rather than rely upon prior definitions of "abandoned" or inapplicable definitions of "desertion," we turn to the dictionary definition of "abandon." See *Johnson v Pastoriza*, 491 Mich 417, 436; 818 NW2d 279 (2012) (stating that this Court may consult dictionary definitions if the legislative intent cannot be determined from the statute itself). *Merriam-Webster's Collegiate Dictionary* (11th ed) defines "abandon," in relevant part, as "to give up with the intent of never again claiming a right or interest in; to withdraw protection, support, or help from." Therefore, the act of abandonment under MCL 712A.2(b) must be an intentional act on the part of the parent to give up his or her rights to the child. With that definition in mind, we turn to petitioner's arguments on appeal.

On appeal, petitioner faults respondents for failing to tell the caseworker in Michigan that they needed transportation assistance in order to retrieve the child from Michigan. Further, petitioner complains that the record does not include any evidence that respondents were struggling financially such that they could not travel to Michigan. The burden, however, was on petitioner

-4-

to prove by a preponderance of the evidence that there were statutory grounds to exercise jurisdiction under MCL 712A.2(b). See *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014). The lack of evidence as to respondents' financial ability and availability of reliable transportation, therefore, does not warrant reversal.

Next, petitioner points to the incident at the gas station as support for a finding that respondent-mother abandoned the child. Petitioner notes that respondent "walked away" and refused to continue the journey to Michigan, and there was testimony that she did not contact the grandparents for 48 hours after she left them. However, based upon the testimony, within ten minutes of respondent walking away, the grandparents drove away with the child. Respondent-mother had left both her child and her luggage in the vehicle, which allows for an inference that she intended to return to the vehicle after she had calmed down from the incident. Moreover, there is testimony that within minutes of the grandparents leaving respondent-mother, she called them and told them that she had reported to the police that they had kidnapped her child. That prompt call to law enforcement after the grandparents left her at the gas station without her child allows for a reasonable inference that she did not intend to give up her rights to the child. Instead, she was actively taking steps to have him returned to her. And the fact that in later communications with the grandparents she repeatedly asked them to return the child to her also weighs against a finding that she intended to give up her parental rights to the child when she walked away from the vehicle he was in following a heated argument.

Petitioner next faults respondent-mother for objecting to the legal guardianship because the guardianship would have allowed the child to have proper protection, support, and care. However, opposing a guardianship is not the same thing as abandoning a child. Rather, it demonstrates that respondent-mother took active steps to retain custody of her child. Petitioner also points out that respondent-mother did not execute a power of attorney; but the caseworker admits that respondent-mother was never asked to do so. Thus, that too does not demonstrate an intent to abandon the child.

Next, petitioner argues that respondent-mother abandoned the child because, after being told that there was nothing preventing her from retrieving the child from Michigan, respondent-mother did not travel from Texas to Michigan to pick him up.[2] Yet, respondent-mother was only told that there was no legal barrier to her regaining custody of her child two days before the petition was filed. There is nothing on the record to suggest that respondent-mother had the ability, in that two-day period, to make the trip first to Michigan and then back to Texas with an infant. Nor is there any indication that she was aware that she had only two days to do so before the petition would be filed. Rather than demonstrate abandonment, the fact that, two-days before the petition

---

[2] Although the caseworker evidently told respondents that they were free to retrieve the child two days before the petition was filed, it is not clear whether they would have actually been allowed to take the child and return to Texas had they shown up prior to the petition being filed. Indeed, the record reflects that someone directed the grandparents not to reveal the child's exact whereabouts, that the grandparents were refusing respondent-mother's requests to have the child returned, and that the caseworker in Michigan was actively communicating with them regarding the intent to file a petition to initiate child-protective proceedings.

was filed, respondent-mother was still asking the caseworker how she could regain custody of her child shows that she did not intend to give up her parental rights to him. Indeed, from the outset of this case, respondent-mother has appeared at and participated in every proceeding. Her consistent participation in the proceedings is at odds with an intent to abandon.

Based upon the foregoing, the trial court did not clearly err by finding that jurisdiction did not exist as a result of respondent-mother's alleged abandonment of the child.

As it relates to respondent-father, petitioner argues that his intent to abandon the child is demonstrated by his refusal to travel to Michigan where he could live with and pay rent to friends of the grandparents and obtain "treatment." Petitioner also points out that the caseworker informed respondent-father that he was free to come to Michigan to pick up the child before the petition was filed, but that the record does not show that any plans to do so were made.

Yet, there is also substantial evidence indicating that respondent-father did not intend to give up his rights to the child. He visited his child in the hospital. And he became upset when told that the child would be taken to Michigan. Based upon his angry reaction and an alleged threat to kill the grandfather, the grandparents "kind of stayed away from him" and declined to respond to text messages that he sent to them. Although respondent-father's becoming upset with the options presented to him and allegedly threatening the grandfather were very poor decisions, respondent-father's actions did not establish that he intended to give up his rights to the child.

Moreover, respondent-father's actions after the child was removed from Texas did not evidence abandonment. Just like respondent-mother, respondent-father was never offered any assistance in visiting or retrieving the child from Michigan. Respondent-father communicated with the caseworker throughout the case and was present at and participated in every proceeding. As with respondent-mother, it is unclear if respondent-father was even aware of the need for a power of attorney because the caseworker did not recall discussing it with him. In light of respondent-father's demonstrated interest in the proceedings involving his child, we conclude that the trial court did not clearly err by finding that jurisdiction was not warranted on the basis that he intended to abandon the child.

## 2. PROPER CUSTODY OR GUARDIANSHIP

Petitioner next argues that statutory grounds existed under MCL 712A.2(b)(1) because the child was "without proper custody or guardianship." This language "does not mean a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance." MCL 712A.2(b)(C). "[I]f a parent places a child in the care of a relative whose home is not unfit, then the 'without proper custody or guardianship' language is not satisfied." *In re Dixon (On Reconsideration)*, 347 Mich App 337, 356; 14 NW3d 497 (2023). Conversely, placing the child with a relative whose home is unfit necessarily means "the parent has not provided proper care and custody." *Id*. at 356-357.

Petitioner's position is that the child was without proper custody or guardianship because of (1) respondent-mother's actions at the gas station, (2) respondents' failure to make special arrangements with the grandparents for the child, and (3) respondents' failure to financially

provide for the child once he was brought to Michigan.  In support, petitioner cites *In re Ernst*, 130 Mich App 657, 663; 344 NW2d 39 (1983) for the proposition that a parent does not provide a child with proper care and custody by leaving the child in the care of a grandparent for an indefinite time without indicating that he or she would be responsible for the child's expenses and without regularly communicating with the child.  Petitioner also cites *In re Baham*, 331 Mich App 737, 749-750; 954 NW2d 529 (2020), in which this Court held that there was no plain error in the trial court's decision to take jurisdiction over the child because there was no evidence that the respondent had placed the child with a relative prior to the filing of the petition.  *Id*. at 749.  Rather, the petition was filed while the child was still in the hospital, and although the respondent had discussed a guardianship, there was no definitive agreement or plan reached.  *Id*. at 749-750.

The present case presents a unique and troubling fact pattern that is distinguishable from *Ernst* and *Baham*.  *Ernst* involved a situation in which the parent specifically left the child with the grandmother without any arrangement or indication that the placement would be temporary.  *Ernst*, 130 Mich App at 663.  In contrast, the present case involved superseding circumstances when the grandparents decided to completely remove the child from respondents' care and custody by hiding him and taking him to another state.  Respondents' actions were not a "complete failure to remain in contact with" the grandparents and the child, see *id*. at 663-664; in fact, as discussed in the prior section, the evidence showed the contrary.  *Baham* is even more distinguishable because the petition was filed while the child was still in the hospital, which did not occur in the present case.  See *Baham*, 331 Mich App at 749.

Although the grandparents were in contact with law enforcement, Texas CPS, and Michigan CPS, the record nevertheless reflects that no court order authorizing the removal of the child from respondents' care had been entered in either Michigan or Texas.  Moreover, the grandparents were not the child's legal guardians and did not have a power of attorney over him. Thus, although the grandparents were guided by others to take the child from respondents' care, they ultimately acted without respondents' permission, without any other legal authority, and without any basis to conceal the child's location.  Consequently, it is clear that the reason for the lack of proper care and custody was because the child was removed from their care without permission or apparent legal authority.  Indeed, the record contains little information about what legal authority (if any) supported the grandparents' actions.  There was no information presented regarding what legal authority Texas had over the child, what Texas CPS and Texas law enforcement did regarding the kidnapping allegations, why the grandparents were instructed to withhold their location from respondent-mother, why the grandparents were encouraged to continue with the child to Michigan, or what authority allowed the grandparents to do so.  To be sure, apart from general statements about Texas CPS being "involved . . . and . . . threatening to take her baby" little was said on the matter.  In the face of such uncertainty, we discern no error in the court's findings regarding the lawfulness of the child's removal.

Ultimately, although respondents may not have made the best decisions, the grandparents unilaterally removed the child to Michigan—without clear evidence of legal authority to do so— and little effort was made by petitioner to reunify the family.  The court found that removing a

child without legal authority and failing to provide respondents with assistance to retrieve the child could not support the exercise of jurisdiction. That decision was not clearly erroneous.[3]

### 3. UNFIT HOME ENVIRONMENT

Finally, petitioner argues that jurisdiction was proper under MCL 712A.2(b)(2) because the child's "home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent . . . is an unfit place for the juvenile to live in." Petitioner argues that respondents' substance-abuse history at the time of the child's birth made the home environment unfit. However, the court found that the evidence did not adequately establish that respondents were engaged in substance abuse at the time the petition was filed. There was no evidence to refute respondents' claim that they had been unaware of the pregnancy until the child was born, nor was there any conclusive evidence that respondents had engaged in substance abuse after his birth. Overall, there was a lack of evidence regarding the results of the drug tests that respondents submitted to in Texas. Given the record in this case, we are not left with a definite and firm conviction that the trial court made a mistake. While there was evidence of substance abuse prior to the child's birth, the evidence from the postbirth tests was far from conclusive in establishing active substance abuse after his birth. The types of tests were unknown, respondents claimed that the results changed each time, and respondents denied actively abusing substances. It was not known whether the tests reached days or weeks back in time. The burden was on petitioner to show that jurisdiction was proper, *Sanders*, 495 Mich at 405, but petitioner failed to present conclusive evidence regarding substance abuse after the child's birth.

### 4. REASONABLE EFFORTS TO PREVENT REMOVAL

Finally, petitioner argues that the trial court erroneously considered whether there had been reasonable efforts to prevent the child's removal as part of its jurisdictional decision. We disagree. Here, the trial court noted that petitioner failed to make reasonable efforts to prevent the child's removal from respondents. No home evaluation was completed, Texas CPS was uncooperative, no additional drug testing occurred, respondents were not referred for substance-abuse or mental-health treatment, the caseworker made no attempt to follow-up with respect to the program that respondent-mother mentioned, no assistance was provided for respondents to retrieve the child from Michigan, no assistance was provided to help respondents prepare for caring for the child, and petitioner did not refer respondents to any services. Moreover, no effort was made to return the child to his parents in Texas once the guardianship with the grandparents was denied.

---

[3] Respondent-father contends that the present case involved due-process violations because the child was unlawfully removed to Michigan, which was subsequently used against respondent-father as a means to try to obtain jurisdiction. See *In re B & J*, 279 Mich App at 19 (holding that due process prohibits a petitioner from seeking to terminate parental rights on grounds that petitioner "intentionally set out to create."). However, we need not address his constitutional concerns given that we discern no error in the trial court's finding that respondents did not fail to provide proper care and custody given the unlawfulness of the child's removal from their care.

The trial court's acknowledgement of petitioner's failure to make reasonable efforts to prevent removal, however, came *after* it had already determined that the evidence presented did not support any of the cited statutory grounds to exercise jurisdiction under MCL 712A.2(b). We conclude, therefore, that the court's comments amounted to nothing more than a chastisement of petitioner for its lackluster efforts at preventing removal in the first place. And, even if the court improperly considered the lack of reasonable efforts to prevent removal as part of the decision, that error was not outcome determinative given that the court's findings that there were not statutory grounds for jurisdiction were amply supported by the record in this case. Reversal, therefore, is not warranted on this basis.

Affirmed.

/s/ Christopher M. Murray
/s/ Michael J. Kelly
/s/ Noah P. Hood